

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00247-CV

_____

IN THE INTEREST OF K.H., Q.H., Q.H., AND S.R., CHILDREN

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. 13073-JR-A

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

This accelerated appeal arises from a final judgment in a suit in which termination of the parent-child relationship was at issue.[1]  The children are Rachel, Josh, Allen, and Sally.[2]  The parents are Mother, who is the biological mother to all four children; Harry, who is the biological father to Rachel, Josh, and Allen; and Reagan, who is Sally's biological father, but he has not appealed the termination of his parental rights.

In two issues, Mother argues that the evidence is legally and factually insufficient to show that termination of her parental rights was in the children's best interest.  In one issue, Harry argues that the "trial court erred in allowing the jury's decision to terminate [his] parental rights without providing him any meaningful way to participate in the proceedings, therefore violating his Federal and Texas rights to due process."  Specifically, Harry argues that the trial court erred by not granting him a bench warrant to allow him to participate in trial.  We will affirm.

---

[1]*See* Tex. Fam. Code Ann. § 109.002(a-1).

[2]In order to protect the identity of the minor children in this case, we use aliases or initials in the place of proper names when referring to a child or the parents. *See* Tex. R. App. P. 9.8 cmt., 9.10; Tex. App. (Fort Worth) Loc. R. 7.

II. BACKGROUND

After Mother gave birth to Sally on January 19, 2018, Sally tested positive for cocaine and marijuana. The Department of Family and Protective Services then removed all four children from Mother's care. Eventually, the Department sought termination of Mother's, Harry's, and Reagan's parental rights to Rachel, Josh, Allen, and Sally.

## A. Mother's Initial Testimony

At trial, the Department called Mother to testify. Mother confirmed that the Department became involved in her and her children's lives when Sally tested positive for cocaine and marijuana. Mother admitted that she had used both drugs toward the end of her pregnancy with Sally, but Mother said that she had only used cocaine once and that she has not used the drug since. She also averred that she had only used marijuana once, sometime between New Years 2019 and Easter 2019, since her pregnancy with Sally. Mother agreed, however, that she had tested positive for cocaine and marijuana multiple times during the pendency of this case.

Mother testified that she remembered when the court ordered her service plan and that it had been impressed upon her by the trial court that failure to follow her service plan could result in her parental rights being terminated. Mother said that she knew that as part of her service plan, she was expected to submit to random drug testing. Initially, Mother averred that she had never missed or refused a drug test, but then after being confronted with the fact that she had missed three drug tests, she

3

admitted that she had missed one because of a lack of transportation and another because she was in jail. According to Mother, on the occasion she lacked transportation, she did not return her caseworker's text telling her to submit to the test. And even though the Department had previously provided her transportation for other tests, Mother did not call her caseworker to inform him that she lacked transportation. Mother acknowledged that she had tested positive for cocaine on June 6, 2019, two days after she had been released from jail.[3] She also agreed that she had been told by her caseworker that she had tested positive for cocaine on May 21, 2019, when she had sought medical care for her sickle cell anemia, but Mother swore that she had not used the drug during that time period.

Mother also said that although she had not told the Department, doctors confirmed on May 21, 2019, that she was again pregnant. Mother agreed that using cocaine or marijuana while pregnant could be dangerous to her and her unborn child.

Even though she said multiple times that she had only used cocaine once toward the end of her pregnancy with Sally, at other times Mother testified that she had used cocaine "a few times." Specifically, Mother admitted that she had used cocaine a week before Sally's birth and at least once prior to November 2016, before she was pregnant with Sally.

---

[3]The record indicates that Mother was arrested and taken to jail for possession of drug paraphernalia in May 2019.

4

Mother stated that even though she had gone to domestic-abuse counseling and had learned that the best course of action was to stay away from abusive people, during November 2018, after she had attended the classes, she called the police multiple times regarding Reagan. One of these incidents included Reagan punching Mother in the eye, and another involved Reagan pulling Mother's hair and slapping her in the face. Mother averred that she never pressed charges against Reagan because the two had broken up, but after the couple had ended their relationship, Reagan began to send threatening text messages to Mother telling her that he was going to kill her. After the text messages, Mother told police that she wished to press charges, but she never did. Mother also recalled an incident that occurred late in November of 2018 wherein Reagan threw a rock through Mother's bedroom window. Again, Mother told police that she would prosecute, but she never did.

Even though Mother claimed that she was no longer in a relationship with Reagan, she agreed that Reagan was the father of the child she was carrying at the time of trial. She also agreed that she called Reagan while she was in jail for the paraphernalia charge, and he bailed her out. The Department also introduced evidence that Mother had reported domestic violence between her and Reagan in February and March of 2017 and in November of 2018.

Mother said that when she was in a relationship with Harry, he also physically assaulted her but that she did not involve the police. Specifically, Mother said that Harry had beaten her, slapped her, punched her, choked her, and held her hostage

with a gun. According to Mother, she previously lived in Florida, and Harry had stayed with her and her children for a short time while they lived there, but Mother averred that Harry did not have a lot of contact with his own children because he was repeatedly arrested. She testified that Harry's abusive behavior did not begin until they had moved to Texas. She also said it was no longer appropriate for Harry to have contact with his children because he was currently facing capital-murder charges for having murdered his girlfriend.

Mother said that she had completed some of her court-ordered services, including attending and completing anger management counseling. Mother testified that she always reported her living arrangements and her employment status to her Department caseworker, but she agreed that despite her service plan's requirement to do so, she had never provided pay stubs or a monthly budget to her caseworker. Mother stated that she had always lived in a safe and stable home with working utilities during the pendency of this case, but that when she lived with her brother, despite the requirements of her service plan, she never provided the Department with her brother's name, date of birth, driver's license number, or his social security number. Mother averred, however, that she had lived in home environments that contained both illegal drug use and domestic violence.

Mother also said that, in accordance with her service plan, when she had visitation with the children, she would always bring the kids things like toys or clothing. Mother stated that she had not complied with or fully participated in a drug

6

and alcohol assessment as required by her service plan. She also agreed that she had not fully complied with her requirements regarding visitation with the children. Mother further admitted that she did not fully comply with her court-ordered drug treatment.

Mother said that despite her earlier testimony that she had never used drugs once the Department became involved in her life, she had smoked marijuana during the pendency of this case. She also reiterated that even though drug testing showed otherwise, she had not used cocaine since Sally was born.

Mother averred that she had been incarcerated on three different occasions, once for burglary of a habitation and twice for theft. She also said that she had been in jail more than a dozen times, most recently for possession of drug paraphernalia.

Regarding her plans for the four children if they were returned to her, Mother said that she intended to continue living with her brother and his girlfriend, that her brother was aware that she might move four children into the home with them, and that brother's home had five bedrooms. Mother said that she planned to enroll the three older children in school and that she would primarily care for Sally but that because she intended to get another job, her brother would care for Sally while she worked. Mother admitted that her brother had served more than five years in prison prior to 2015 for aggravated assault causing bodily injury. Mother also said that she intended to live with her brother only for a short time and then move to Fort Worth.

7

On cross-examination, Mother acknowledged that she had lied about being pregnant to Allen and Sally's ad litem attorney at visitation on May 21, 2019. She also said on cross that, although Harry had committed what she considered abuse against Rachel and Josh, she believed it was justifiable discipline because the children had disrespected Harry, and one is to "honor your mother and your father."

## B.    Rachel's Testimony

Rachel testified via video testimony.[4]   Rachel said that at the time of her testimony she was eleven years old and in the sixth grade. She also said that Harry was her father, that Mother was her mother, and that Josh, Allen, and Sally were her siblings. Rachel said that she loved each of her siblings.

Rachel recalled living with Mother and her siblings prior to being removed in January 2018. By Rachel's account, Mother was a good cook, she kept the house clean, and Rachel said that she loves her. Rachel also said that her mother had expected her to follow rules and to do her chores but that she never feared Mother. She further stated that when she lived with Mother there was always plenty of food and clothing and that all the utilities were functioning.

According to Rachel, she had lived in eight different placements in varying Texas towns and cities during the pendency of this case. Rachel said that she never

---

[4]*See* Tex. Fam. Code Ann. § 104.003(a) (allowing for the testimony of a child to be taken and recorded outside the courtroom for the purpose of showing the recorded testimony at trial).

lived in one foster home for more than a few months. Sometimes Rachel was placed in the same place with her brothers but at other times she lived in a separate foster home. Rachel said that she had never been placed with Sally. Rachel stated that being separated from her siblings had been hard on all of them.

Rachel recalled that her move away from one of the foster homes was because another child had touched her "in a weird way." She also recalled how her brothers and she had been placed with Aletha Redd, who was Harry's current girlfriend's mother, but that after three weeks Redd dropped them off at a mental hospital and drove away.

At the time of her testimony, Rachel lived in the Children's Home in Wichita Falls but plans had already been made to move her to a ninth foster home the next day. Rachel also averred that moving several times had made it hard for her to make friends at school but that when she lived with Mother she had gone to the same school and had friends.

When asked what her wishes were, she said that she wanted "to go home" because she missed Mother and her siblings. When asked what she wanted the jury to do with her siblings, Rachel said that she wanted them to also be allowed to come home. She further testified that during visits with Mother, Mother had often brought her "[n]ew shoes, new clothes, fanny packs, [and] all types of stuff."

Rachel said that she had never seen Reagan hit Mother when he was around prior to removal and that she had never feared him, but she did recall that Mother had

said Reagan had pulled Mother's hair once. She did remember Mother and Reagan having argued, and she believed that Reagan took illegal drugs because of the way he had behaved sometimes. She also remembered a time when Mother had refused to let Reagan in the house, and he got angry and beat on the door.

Rachel testified that she did not have a relationship with her father, Harry, but she did remember that Harry used to hit Mother because Mother would cry and tell Rachel what had happened. Rachel said that she knew that Harry used marijuana because "he kept on saying that he wanted it." She also said that she had never seen Mother do drugs other than the ones prescribed for Mother's sickle cell anemia. But Rachel said that she was aware that Sally had been born with both cocaine and marijuana in her system and that meant that Mother must have used both drugs.

According to Rachel, when she was in Redd's care, Harry had visited them and sometimes watched them when Redd was sick. Rachel was also aware that Mother had spent time in jail and prison.

## C.    Josh's Testimony

Josh also testified via videotaped testimony. Josh was eleven years old at the time of his testimony and about to enter the sixth grade. By Josh's account, he had been in the Department's care since January 2018. Josh said that he was close to Rachel and that he enjoyed Allen and Sally. Much like Rachel's testimony, Josh said that Mother was a caring mother and that in addition to cooking and cleaning the house, she had also imposed rules and chores on him and that he had learned to be

10

polite from Mother. And like Rachel, Josh said that he had lived in at least eight foster homes during the pendency of this case and that most of the time he had been placed with Allen, but rarely were he and Allen placed with Rachel. Josh said that he never lived in the same home as Sally.

Josh also recalled how, after the children had been placed with Redd and after Redd had gotten into an argument with Mother over the phone, Redd had dropped him and his siblings off in front of a mental hospital and drove away.[5] Josh said that he had never feared Mother, that she had made sure that he and his siblings attended school, and that he had enjoyed the schools he went to while living with Mother. Josh averred that he was a happier child when he lived with Mother, that he always felt safe in her care, and that he was asking the jury to let him live with Mother and his siblings.

Josh stated that he missed Mother and his siblings and that being separated from them had been hard on him. Josh expressed that he no longer wanted to move from house to house and that he "just want[ed] to stay home." He also said that he was tired of having to learn to get used to living with people he did not know.

---

[5]The record indicates that it was Mother and Harry who requested that Rachel, Josh, and Allen be placed with Redd as a "fictive kin" placement. The record also indicates that the children's placement in other relatives' homes was at the behest of the parents. Thus, some of the multiple placements were predicated on the parent's requests and not necessarily because of instability in the prior placement.

Josh testified that when Mother had visited him, she had brought him clothes, shoes, and hats. Josh further said that Mother taught him to be polite to adults, to work hard at school, and to pay attention to what his teachers were telling him. Josh described Mother as kind and careful.

According to Josh, since he was removed from Mother's care, he has been prescribed medication for ADHD, something he said he did not take previously. Josh stated that he was aware that Reagan had struck Mother because he had heard their arguments, but he had never seen it happen. By Josh's account, Rachel had witnessed some of the arguing and fighting. And although Josh could not recall what the fighting was about, he did remember Mother telling Reagan to leave, which he eventually did. Josh said that he had heard from Rachel that Sally was born with cocaine in her system but that Mother had never told him as much.

Josh recalled how, when the family was living in Florida, he and his siblings had once been removed from Mother's care and placed in a foster home when Mother went to jail. Josh also said that although Mother had never said as much, he interpreted Mother's relationship with Reagan as a "dating" relationship and that this relationship had gone on through the pendency of this case. Josh refers to Reagan as his "stepdad."

## D. The Department's Caseworker's Testimony

Omarion Bradford testified that he was the Department's caseworker involved in these proceedings. After discussing Harry's lack of involvement with this case,

12

Bradford said that on one occasion during the pendency of this case, Mother had allowed Harry to stay the night with her, and Bradford had once seen Mother in Harry's car.

Regarding Mother's drug use, Bradford testified that in all, Mother had failed seven drug screenings by either failing to show up or by testing positive for marijuana or cocaine.

Bradford averred that Mother had not complied with many of the provisions of her service plan. Bradford said that it was inappropriate for Mother to continue to have a relationship with Reagan and that she should have learned in the domestic-violence classes to separate herself from abusive people and that Reagan was one of the people she should avoid. He also stated that Mother's continued relationship with Reagan demonstrated her inability to provide a safe environment for the children, given that in addition to the domestic violence between Mother and Reagan, Reagan has a criminal history that includes assault family violence and multiple arrests for drug possession. Bradford further said that it was his understanding that Reagan is a known member of a street gang named the Hoova Crip Gang in Wichita County and that his association with that gang had been documented as recently as February 2017.

According to Bradford, Mother had not been honest with the Department during the pendency of this case. Specifically, Mother had lied about drug use and her relationship with Reagan. Bradford said that Mother's use of cocaine and marijuana while pregnant with Sally endangered Sally. Bradford also recalled how on more than

one occasion, Mother had attempted to remove Sally from a car seat while the vehicle was moving while Mother and Sally were in the vehicle with Bradford.

Bradford said that he considered Mother and Reagan to be in a relationship because she was pregnant with his child at the time of trial and because he knew that they would say "I love you" to each other as they ended any phone conversations. However, according to Bradford, Mother had denied being in a relationship with him and never told Bradford that she was pregnant with Reagan's child. Bradford stated that Mother had not complied with the condition that she let him know within three days of any address, phone number, or change in circumstances. Bradford also said that Mother had not maintained significant contact with her children, including not making timely and regular visitations that were scheduled by the Department.[6] Bradford said that he first learned of Mother's intentions to move in with her brother if the children were returned to her on the first day of trial when Mother testified. Bradford said that it concerned him for the children's safety that Mother's brother had served more than five years in prison for aggravated assault.

Regarding Sally, Bradford averred that Sally had been with the same foster family since being placed there almost immediately after her birth. He also said that Sally had never been in Mother's care. Bradford said that Sally is doing "extremely

---

[6]Bradford testified that Mother had made only seventy-seven percent of her scheduled visitations and that he did not consider that to be significant contact with the children.

14

well" in her foster home, that the foster parents take her to all necessary doctor's visits, and that Sally is very bonded with the foster parents. Specifically, Bradford said that "[y]ou couldn't tell that [Sally] wasn't [the foster parent's] child." Bradford further stated that at the end of Mother's visits with Sally, Sally would immediately run to her foster parents when they returned to pick her up. Bradford also testified that the foster parents had consistently transported Sally to visitations, some of which Mother missed, and that they had attended the majority of the court proceedings in this case.

Bradford said that Mother's drug use, continual involvement in domestically abusive relationships, and her repeated contacts with law enforcement demonstrated that Mother had engaged in conduct which endangered the physical and emotional well-being of Sally. Bradford said that the Department was asking that both Mother's and Reagan's parental rights be terminated because the Department's plans for Sally were for the foster parents to adopt her, and they have expressed a desire to do so.

According to Bradford, initially when Mother had visited the children, she would be disengaged and mainly payed attention to her cell phone, but "towards the end that was corrected." Bradford said that although Mother often appeared to be a "good parent," her continuing involvement in domestically violent relationships, her repeated arrests, her changing stories, her lying, and her drug use demonstrated a failure in parenting abilities as well as an inability to provide any of the children with a safe environment. Bradford also said that Mother's past conduct had allowed Rachel,

15

Josh, and Allen to remain in an environment which endangered their physical and emotional well-being and that Mother had also placed Rachel, Josh, and Allen with individuals who engaged in conduct that endangered their physical or emotional well-being.

More specifically regarding Rachel, Josh, and Allen, Bradford said that initial placement of the three siblings in foster care had not worked out because the children had difficulty adapting to foster care and that the foster parents asked that the children be removed from their care after only six weeks. The siblings had then been placed together in a second foster home, but again that did not work out and lasted only six weeks because Allen was having issues with other foster kids in the home. From there, the Department placed Josh and Allen together in a foster home and Rachel in a separate foster home.

Rachel's stay in her third foster home did not last long because, according to Bradford, another foster child had spanked Rachel on her bottom. The Department relocated Rachel to a fourth foster home. And then, because it had ostensibly been urged by the parents, the Department relocated Rachel to Mother's cousin's home and Josh and Allen to another nearby cousin's home. Neither of these placements ultimately worked out, and the three children were again moved to other foster homes, only this time in different homes in different cities. Not long after that, the three children were placed in the home of a "fictive kin," Redd, whom the three children knew. Bradford averred that while there, Harry, against the Department's

16

edicts, had watched the three kids by himself. Bradford also said that there was evidence that Harry had physically abused Rachel during that time. Redd ultimately decided that she could not care for or tolerate the children, and she dropped them off in front of a mental hospital and drove away. After that, the three children were placed in the Children's Home in Wichita Falls.

At the time of trial, the three children had been placed in three separate foster homes or facilities in three different cities in Texas. In all, Rachel, Josh, and Allen have each been placed in more than eight different foster homes or facilities during the pendency of this case. But Bradford did testify that while Josh and Allen were placed in a foster home in Houston and Rachel was placed in a separate foster home in Houston, all three had been "doing real good," but that their parents had requested a fictive kin placement; thus, the children were removed. Bradford averred that despite the many moves, Josh and Allen were doing well in school and that Rachel was at the same level as she was prior to the Department's involvement.

With regard to Rachel's current placement, Bradford said that he had visited the foster home, that Rachel was getting "along real well," and that there was a foster girl around Rachel's age who is also living in the same foster home. In contrast, Allen had already experienced behavioral problems in a new foster home, including breaking a window with a brick, attempting to drive the family's four-wheeler without permission, chasing another foster child with an electric drill, riding his bike in the middle of the street, and attempting to unbuckle his seat belt and open the car door as

the foster parents were driving. Because of these acts, Allen is now in a residential treatment center for children with aggressive-behavior issues. Bradford recommended that due to Allen's behavioral issues, the residential treatment center was currently the best place for him to remain because there are advanced medical, counseling, and psychiatric treatments available to him.

At the time of trial, Bradford had not heard how Josh was doing in his current placement. Bradford did testify, however, that Josh told one of his foster parents that he had seen Mother having sex twice, that he did not like how many boyfriends Mother had, and that he wanted to return to Mother's care even though at times he had not had enough food while in her care.

Bradford averred that the Department would make concerted efforts to make sure the children had visitations with each other in the future. He also said that he believed that ultimately the Department would be able to find an adoptive home so that Rachel, Josh, and Allen could live together and that the Department had already been approached by people who know the children and voiced a desire to adopt all three. Bradford did say that Sally's foster parents were only interested in adopting Sally, but that the Department anticipated that the three older children should be able to maintain contact with her.

Bradford testified that the best course of action for all four children was that each of the parent's rights be terminated so that the Department could facilitate the children being adopted. He also said that if any one of the parents maintained

18

parental rights, the Department would be hindered in attempting to find an adoptive home.

**E.    Mother Returned to the Witness Stand**

Mother's attorney later called Mother again to take the stand. This time, Mother testified that Rachel is a beautiful and intelligent girl who likes to sing and dance. According to Mother, prior to her removal, Rachel and she had liked going to get their nails done, and Rachel loved to go to Walmart. Rachel also helped cook the family's meals. Mother described Josh as being an intelligent kid who likes to play football but cleans and cooks as well. Mother described Allen as being funny, intelligent, and "spoiled." According to Mother, Allen likes to watch movies and cartoons with her.

Mother said that she had conditioned her kids to clean their own rooms, to wash dishes, and to do laundry as chores. Mother said that she had routinely checked on the children's homework and that she had made sure the children went to school regularly. Mother said that if any of the children had acted up, her mode of discipline was to ground the child and take away privileges, like video games.

Mother said that the children's routine had been to get up at 6 a.m., to most often eat breakfast at home, and then to walk to school with a group of kids. The children had normally come home after 3:35 p.m., when school let out. Once Mother was home, she said that she had often checked to make sure the children had done their homework, and then she would cook dinner. Mother said that the children had

19

routinely bathed and brushed their teeth. She also said that they had always worn clean clothes, and she had ironed their clothing if needed.

By Mother's account, none of the children had needed prescription drugs prior to being removed. She also averred that Rachel was previously always laughing, smiling, and joking, but now she seems "more shut down[,] sad[,] and depressed." She said that when they had lived with her, the children were very polite and said "yes, ma'am" or "no, ma'am," but now the children are less respectful. Specifically, she said that Allen had never acted out the way that he does now.

Mother said that her own brother's behavior had significantly improved after he served time in prison and that he is now very responsible. Mother said that her brother's house is clean, that he has plenty of food, and that all utilities are available. Mother testified that if the children were returned to her, she would send them to counseling to recover from the process of having been removed and then moved so frequently. Mother also said that money for counseling would not be an issue because the children have Medicaid. Mother denied that she had ever taken Sally out of her car seat when the Department was transporting them. Mother said that the reason she had told Reagan she loved him at the end of phone calls was because she was in jail and attempting to have him bail her out. But she admitted that she had recently had sex with Reagan and that she had put on her Facebook page that she was engaged. She also agreed that she had messaged or called him throughout the weeks leading up to trial and even during trial. By Mother's account, Reagan had messaged

her more than ten times during trial. Mother said that over the last year she had spoken, seen, or communicated with Reagan "often."

## F.     The CASA Guardian Ad Litem's Testimony

Kristen Henry, the CASA guardian ad litem for the children, testified that she visited with all four children at least a couple of times a month during the pendency of this case. Henry said that despite Mother having a duty to inform Henry where she was living, she had not informed Henry that she (Mother) had moved in with her brother. Henry said that Mother had moved quite often during the course of this case and that this was evidence that Mother had a pattern of unstable living arrangements. Henry also said that three of the placements for the children were placements given to the Department by the children's parents and that it was concerning that the people recommended by the parents could not adequately supervise the children. Regarding Allen's behavior, Henry opined that because Allen had moved around so much he had grown frustrated because he had not had "time to actually be a kid." Henry also said that after being discharged from one of the foster homes that the parents did not recommend, Allen had told her that he desired to return to that foster home and was very frustrated that he could not. Henry further said that Allen was in need of structure in his life and that she did not believe that either Harry or Mother were in a position to provide him the structure he needs.

21

Henry said that the children have knowledge of gangs. Specifically, Henry recalled that she had taken the children to the park, and upon their return, Josh and Allen were exchanging gang signs between each other.

Although Henry acknowledged that this case had been difficult and that there was no "ideal solution" for the children, she did not believe the children would be safe with Harry or Mother, and she said she believed that it was in each of the children's best interest that their parents' rights be terminated. Henry also averred that once the children are in a more permanent place, they will likely receive more stable and consistent counseling than they do now given how much they had moved.

According to Henry, she had inquired of Allen where he wished to be permanently placed, and his initial response was with one of his prior foster homes. Henry said, however, that when Allen was in the presence of his older siblings who had expressed a desire to return to Mother's care, he then said he too wanted to return to Mother. Henry agreed that Rachel and Josh have always maintained a desire to be returned to Mother and that they love her. Henry said that when she had observed Mother's visits with the children, the children seemed happy, Mother instructed the children to be polite, and the children's bond with Mother was obvious.

Nonetheless, Henry said that given Mother's continued drug use, unstable living environments, and her continual involvement with domestic abusers, she believed it was still in the children's best interest that Mother's rights be terminated. Henry said that she did not find Mother's explanation that she was being nice to

Reagan in order to be bailed out of jail to be credible given that she continues to hang around him and is now again pregnant with his child. Henry said that in her experience it is not uncommon for children to move from place to place while in the Department's care, but she said that she had seen a number of children adopted under similar circumstances—including multiple placements during pendency of a case and including children with behavioral issues—once the parent's rights had been terminated. Henry did state, however, that she had seen a number of children in the Department's care not get adopted.

Henry acknowledged that she had no reason to disbelieve Mother's testimony that when the children were in her care, Rachel practiced good hygiene. However, she further acknowledged that through the course of this case, Rachel had developed issues with maintaining good hygiene. Henry recognized that Allen's behavior had gotten worse since being removed from Mother's care, and she attributed that to the many moves that he had experienced while in the Department's care.

## G.    The Outcome of Trial

A jury ultimately found that Mother, Harry, and Reagan had all committed acts under Texas Family Code Section 161.001(b) and that termination of the parent's parental rights was in each of the children's best interest. The trial court rendered judgment accordingly. In its final order, the trial court named the Department as permanent managing conservator (PMC) to all four children. Mother and Harry now appeal.

23

## III.  DISCUSSION

### A.    Mother's Appeal

In two issues, Mother argues that the trial court's judgment, which was predicated on the jury's verdict, terminating her parental rights to all four children should be reversed because the evidence is legally and factually insufficient to support the trial court's best interest findings to each child.  We disagree.

#### 1.    Sufficiency Standards and the *Holley* Factors

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence:  1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and 2) that termination is in the child's best interest.  Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven.  *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in the light most favorable to the finding and judgment.  *Id.*  We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.  *Id.*  We disregard all

24

evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *In re E.N.C.*, 384 S.W.3d at 808.

In evaluating the evidence for factual sufficiency in parental termination cases, we are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28.

Nonexclusive factors that the factfinder in a termination case may also use in determining the best interest of the child include the following: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the

26

best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### a. The Desires of the Children

With regard to Sally's and Allen's desires, Sally was less than two years old at the time of trial, and Allen was six years old; thus, neither child possessed sufficient maturity to express an opinion regarding a parental preference, and neither Sally nor Allen testified at trial. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.) ("The record contains scant evidence that any of the children possess sufficient maturity to express an opinion regarding a parental preference."); *L.Z. v. Tex. Dept. of Family and Protective Servs.*, No. 03-12-00113-CV, 2012 WL 3629435, at *10 (Tex. App.—Austin Aug. 23, 2012, no pet.) (mem. op.) (reasoning that a two-year-old child "was too young to articulate his desires" under the desires-of-the-children factor). The jury was entitled to find that this factor weighed neither in favor of nor against termination of Mother's parental rights to Sally and Allen.

With regard to Rachel's and Josh's desires, both Rachel and Josh testified that they wished to be returned to Mother and placed in a home setting that included all four children. This factor weighs against the jury's best-interest determination regarding Rachel and Josh.

### b. The Emotional and Physical Needs of the Children

As for the emotional and physical needs of all four children now and in the future, their basic needs include food, shelter, and clothing; routine medical and dental

27

care; a safe, stimulating, and nurturing home environment; and friendships and recreational activities appropriate to their age. *In re L.S.*, No. 02-16-00197-CV, 2016 WL 4699199, at *6 (Tex. App.—Fort Worth Sept. 8, 2016, no pet.) (mem. op.). Here, Mother, Rachel, and Josh all testified that Mother provided the children with their basic needs of food, shelter, and clothing. They also testified that Mother routinely required the children attend school, directed them to do chores, and encouraged that they behave politely. Rachel specifically said that she had friends when she was in Mother's care but that she had difficulty making new friends given her numerous placements while in the Department's care. And both Rachel and Josh testified that the frequent placements had been hard on them.

In contrast, Bradford testified that Josh had said that when he lived with Mother there was not enough food. And multiple Department workers testified that Mother had not demonstrated an ability to provide a safe and stable home for the children during the pendency of this case. The evidence indicates that when in Mother's care, the children had been exposed to drug use, domestic violence, gang involvement, and Mother's repeated encounters with police. The jury was entitled to find that this factor weighed in favor of termination of Mother's parental rights to all four children.

        *c.*     *The Emotional and Physical Danger to the Children*

With regard to the emotional and physical danger to the children now and in the future, the record reveals that significant harm could be inflicted on them given

28

Mother's persistent drug use, her repeated encounters with police, her multiple incarcerations and jailing, and her continuous relationships with domestic abusers. Also, the record reveals that Mother attempted to keep her relationship with Reagan from the Department, demonstrating that she knew the relationship is inappropriate. The jury was entitled to find that this factor weighed heavily in favor of termination of Mother's parental rights to all four children.

### d. The Parenting Abilities of Individuals Seeking Custody

Regarding the parental abilities of the individuals seeking custody of Sally, Bradford testified that under the foster parents' supervision, Sally is doing quite well, she has bonded with her foster parents, and she acts as though they are her parents. Bradford said that the foster parents desire to adopt Sally and that they had routinely taken care of her needs. Bradford further said that the foster parents had been actively engaged during the pendency of this case, including transporting Sally for visitations and attending most of the court settings. The jury was entitled to find that this factor weighed in favor of termination of Mother's parental rights to Sally.

With regard to the parental abilities of the individuals seeking custody of Rachel, Josh, and Allen, only Mother and the Department were seeking custody, but Mother has not shown adequate parental abilities. Indeed, even though Mother is said to have taught the children to be polite, to be dutiful at school, and to take responsibilities for chores, multiple Department workers testified that Mother's continued drug use, involvement in domestic-abuse relationships, and her inability to

29

maintain a stable living environment indicated that Mother lacked the proper parental abilities to appropriately care for Rachel, Josh, and Allen. Indeed, even after the commencement of this case, Mother was arrested for possession of drug paraphernalia, and she tested positive for illegal drugs multiple times. Bradford and Henry also both testified that Mother had been dishonest about her drug use and her continued relationship with Reagan, a person that Mother admittedly has called the police on several times for domestic-violence issues and the man who is the biological father of the child Mother was carrying at the time of trial—a pregnancy that Mother purposely hid from the Department. In contrast, Henry testified that the Department has services available to assist the children, and the Department has the expertise and resources to work toward the three children being adopted together. The jury was entitled to find that this factor weighed in favor of termination of Mother's parental rights to all four children.

### e. Programs Available to Those Seeking Custody

Regarding programs available to assist those seeking custody of the children, the record reveals that although Mother completed one course in domestic-violence counseling, Mother still maintains a relationship with a domestically violent partner. The record also demonstrates that Mother did not complete the majority of her court-ordered services.

As to Sally, the Department put on evidence that she is currently in a stable foster home that provides for her, that it would facilitate counseling if needed, and

that they are potentially willing to allow the four children to see each other after the trial. These foster parents have already demonstrated a persistent involvement in bringing Sally to visitations with her siblings, and they have repeatedly attended court settings regarding this case.

As to Rachel, Josh, and Allen, Henry testified that although the three children have not experienced the benefits of programs to assist them given how much they have moved, she was confident that once Mother's rights were terminated and the Department was made PMC, the Department would be able to facilitate the three children attending counseling and other programs. Further, the Department put on evidence that both Rachel and Allen need prescription medications that they were not receiving under Mother's care. Specifically to Allen, the Department's current plan is to leave him in the residential treatment center where he is currently placed because the treatment center provides advanced medical, counseling, and psychiatric treatments. The jury was entitled to find that this factor weighed in favor of termination of Mother's parental rights to all four children.

f.       *Plans for the Children*
g.       *The Stability of Proposed Placements*[7]

With regard to the plans for the children and the stability of their proposed placements, Mother's plan was simply to move in with her brother with the four

---

[7]*See In re B.R.*, 456 S.W.3d 612, 617 (Tex. App.—San Antonio 2015, no pet.) (analyzing several of the *Holley* factors together instead of analyzing each factor separately).

children for a short while and then move to Fort Worth from Wichita Falls. Bradford testified that this concerned him greatly given that Mother never informed the Department of her moving in with her brother and that Mother admitted that her brother had previously served time for aggravated assault. The record also indicates that Mother had most of her encounters with law enforcement while in Fort Worth.

As to Sally, the only seeming drawback to her current proposed placement is that she will not be placed in the same home as her siblings. But Sally has never lived with her siblings. Indeed, she was removed from Mother's care upon birth because she was born with cocaine and marijuana in her system. Moreover, Sally's foster parents are the only parents Sally has ever lived with, she is bonded with them, and they have demonstrated that they will actively participate in whatever care Sally needs.

As to Rachel, Josh, and Allen, as Henry testified, there is no "ideal solution" for these children. But Henry testified that she believed that once Mother's rights were terminated and the Department became PMC to the children, then their odds of being adopted by the same family would increase. Henry also said that the Department could keep the children involved in programs to assist them and that once their placement became more permanent, then the children would benefit from consistent counseling. The jury was entitled to find that this factor weighed in favor of termination of Mother's parental rights to Sally, and that at worst this factor is neutral as to Rachel, Josh, and Allen.

*h. Mother's Acts or Omissions Indicating that the Existing Parent-Child Relationship is Not Proper*

Considering Mother's acts or omissions that may indicate that the existing parent-child relationship is not a proper one, the analysis set forth above—which details Mother's drug use that continued through the pendency of this case, Mother's housing instability, Mother's continued involvement with domestically abusive partners, Mother's frequent encounters with law enforcement, as well as Mother's failure to take full advantage of the services that she was offered—reveals that the existing parent-child relationship between Mother and all four children is not a proper parent-child relationship. The jury was entitled to find that this factor weighed in favor of termination of Mother's parental rights to all four children.

*i. Any Excuse for the Acts or Omissions of the Parent*

As for any excuse for Mother's acts or omissions, the jury heard evidence that Mother lied about her drug use and her relationship with Reagan. Mother presented no evidence at trial excusing why she repeatedly failed drug tests, failed to take drug tests, or failed to follow her service plan. The jury was entitled to find that this factor weighed in favor of termination of Mother's parental rights to all four children.

**2. The Evidence is Legally and Factually Sufficient to Support the Jury's Best-Interest Findings**

Viewing all the evidence in the light most favorable to the best-interest findings and considering the nonexclusive *Holley* factors, we hold that the jury could have reasonably formed a firm conviction or belief that termination of the parent-child

33

relationship between Mother and the children was in the children's best interest, and we therefore hold the evidence legally sufficient to support the jury's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *see also In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *11–12 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.) (holding evidence legally sufficient to support best-interest finding based on mother's lack of a safe, stable home environment; noncompliance with services; and drug use).

Similarly, reviewing all of the evidence with appropriate deference to the factfinder, we hold that the jury had sufficient evidence before it that was relevant to the *Holley* factors from which it could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Mother and the children was in the children's best interest, and we therefore hold that the evidence is factually sufficient to support the jury's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan*, 325 S.W.3d at 733 (holding evidence factually sufficient to support best-interest finding when most of the best-interest factors weighed in favor of termination); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to

comply with [a] family service plan support a finding that termination is in the best interest of the child."). We overrule Mother's first and second issues.

## B. Harry's Appeal

In his sole issue, Harry argues that the "trial court erred in allowing the jury's decision to terminate [his] parental rights without providing him any meaningful way to participate in the proceedings therefore violating his Federal and Texas rights to due process." Specifically, Harry argues that the trial court erred by not granting him a bench warrant to allow him to participate in trial or by otherwise allowing him to participate in some other manner, ostensibly via video or telephonic participation. Harry's argument is that the trial court did not appropriately balance the factors to consider for allowing a bench warrant that are laid out in the Texas Supreme Court's decision in *In re Z.L.T.*, 124 S.W.3d 163, 166 (Tex. 2003). We conclude that Harry failed to carry his burden at trial to show that the trial court erred by denying his request to be allowed to participate.

### 1. Standard of Review and The Law Regarding Bench Warrants

We review a trial court's decision on an inmate's request for a bench warrant for an abuse of discretion. *See id.*; *In re A.W.*, 302 S.W.3d 925, 928 (Tex. App.—Dallas 2010, no pet.). The test for abuse of discretion is whether the trial court's ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000).

It is well settled that litigants cannot be denied access to the courts merely because they are inmates. *Z.L.T.*, 124 S.W.3d at 165. "However, an inmate does not have an absolute right to appear in person in every court proceeding." *Id.*; *see also In re D.D.J.*, 136 S.W.3d 305, 311 (Tex. App.—Fort Worth 2004, no pet.) (reasoning that an inmate, whether plaintiff or defendant in a civil action, does not have an automatic right to appear personally in court). Rather, in determining whether a personal appearance is warranted, the trial court must balance the prisoner's right of access to the courts against the government's interest in protecting the integrity of the correctional system. *Z.L.T.*, 124 S.W.3d at 165; *Heine v. Tex. Dep't of Pub. Safety*, 92 S.W.3d 642, 649 (Tex. App.—Austin 2002, pet. denied).

When deciding whether to grant an inmate's request for a bench warrant, Texas courts apply the factors articulated by the Seventh Circuit in *Stone v. Morris*, 546 F.2d 730, 735–36 (7th Cir. 1976). *Z.L.T.*, 124 S.W.3d at 165. These factors include the costs and inconvenience of transporting the prisoner to the courtroom; the security risk the prisoner presents to the court and the public; whether the prisoner's claims are substantial; whether the matter's resolution can reasonably be delayed until the prisoner's release; whether the prisoner can and will offer admissible, noncumulative testimony that cannot be effectively presented by deposition, telephone, or some other means; whether the prisoner's presence is important in judging his demeanor and credibility; whether the trial is to the court or a jury; and the prisoner's probability of success on the merits. *Id.*; *Heine*, 92 S.W.3d at 650. It is the inmate's burden to

36

show the trial court why his presence is warranted. *Z.L.T.*, 124 S.W.3d at 166; *In re A.W.*, 302 S.W.3d at 929.

The trial court does not have an independent duty to inquire into the necessity of an inmate's appearance beyond the contents of the bench warrant request. *Z.L.T.*, 124 S.W.3d at 166; *In re A.H.L.*, 214 S.W.3d 45, 50 (Tex. App.—El Paso 2006, pet. denied). In *Z.L.T.*, the Texas Supreme Court disagreed with the court of appeals' holding that the trial court had an independent duty to identify and evaluate, on the record, the relevant factors before disposing of the father's motion seeking a bench warrant. 124 S.W.3d at 166. The court pointed out that, in general, Texas rules place the burden on litigants to identify with sufficient specificity the grounds for a ruling they seek. *See id.* (citing Tex. R Civ. P. 21; Tex. R. App. P. 33.1(a)(1)(A)). The court reasoned that a litigant's status as an inmate does not alter that burden. *Id.* The court focused on the fact that the trial court had no responsibility to independently inquire into relevant facts not provided by the moving party, emphasizing that the father's request for a bench warrant included no information by which the trial court could assess the necessity of his appearance. *Id.* Although the father referenced the relevant *Stone* factors in his request, he failed to provide any factual information showing why his interest in appearing outweighed the impact on the correctional system: "the only pertinent information contained in the request was that he was located in Rosharon, Texas, more than 200 miles from the trial court." *Id.* The court ultimately held that the father failed to carry his burden to establish his right to relief and, in light of such

37

failure, the trial court did not abuse its discretion by denying his request for a bench warrant. *Id.*

## 2. Application of Law to The Facts in Harry's Case

Here, Harry's request for a bench warrant was far more deficient than the one in *Z.L.T.* Like in *Z.L.T.*, where the father failed to provide factual information showing why his interest in appearing outweighed the impact on the correctional system, here, Harry provided no other factual information in his request for a bench warrant other than the fact that he was "presently confined in the Tarrant County Jail located at 100 N. Lamar St., Fort Worth, Texas" and that the "necessity exists for the issuance of a bench warrant for [Harry] to be before th[e] Court for the purpose of a jury trial in which a termination is requested of [Harry's] parental rights." Even in his verbal re-urging[8] of his bench warrant prior to trial, all that Harry asserted was that he "ha[d] the right to be" at trial. But unlike in *Z.L.T.*, where the father in that case articulated the *Stone* factors, here, Harry did not mention them in either his written

---

[8]The trial court initially granted Harry's "Application for Bench Warrant," but during a pre-trial hearing held the same day trial was scheduled, Harry's attorney informed the court that the sheriff's office was unwilling to release Harry from the Tarrant County Jail on the bench warrant ostensibly because his bond had been declared insufficient, he had twice cut off his GPS monitoring device, and he was currently being held on capital-murder charges. The trial court did, however, allow Harry's attorney to admit into evidence a letter from Harry in which Harry stated that he loved his children, that he had a relationship with them, that he would go to any lengths to ensure their health and safety, and that he did not want his parental rights terminated "due to [Mother's] actions." *See D.D.J.*, 136 S.W.3d at 314 (discussing other means of participating in trial when an inmate is disallowed personal appearance).

motion or his oral re-urging of his motion for bench warrant. Thus, like in *Z.L.T.*, where the father failed to carry his burden to demonstrate his right to be at trial, here, Harry failed to carry his burden as well. We reject Harry's argument that the trial court failed to weigh the *Stone* factors appropriately because that was his burden, and we conclude that the trial court had no independent burden to analyze those factors for him.[9]

Relying on *In re Daugherty*, 42 S.W.3d 331, 336 (Tex. App.—Texarkana 2001, no pet.), Harry argues that the trial court still should have allowed him to participate in the trial through another means, ostensibly through video or teleconference. But Harry's reliance on *Daugherty* is misplaced. In *Daugherty*, the appellant had argued in a motion for continuance to the trial court that he be able to utilize "an alternative dispute resolution by means of a conference call." But here, in his own verbal motion for continuance, all Harry asked for was a continuance[10] of trial, and he never asked

---

[9]Even though the trial court did not have a duty to do so, we do note that the trial court made several of the *Stone* factor findings in the record.

[10]In his brief, Harry does not mention his motion for continuance in his "Issue Presented." But in his "Summary of The Argument" section of his brief, Harry states that the trial court abused its discretion by denying his motion for continuance. Harry also mentions that the trial court "implicitly" denied his motion for continuance once in the body of his argument. However, the overall argument that Harry is clearly making before this court is that the trial court erred by denying his re-urging of his "Application for Bench Warrant." To the extent that he might have argued the trial court abused its discretion by denying his motion for continuance, Harry would not prevail because he only verbally moved for a continuance without any supporting affidavit. *See In re J.S.*, No. 02-04-00277-CV, 2005 WL 1693537, at *2 (Tex. App.— Fort Worth July 21, 2005, no pet.) (mem. op.) ("If a motion for continuance is not

that he be allowed to participate in trial via some other form of participation other than being actually present. He also did not ask for this in his initial request for a bench warrant. We overrule Harry's sole issue.

## IV. CONCLUSION

Having overruled both of Mother's issues and Harry's sole issue, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: November 22, 2019

---

made in writing and verified, it will be presumed that the trial court did not abuse its discretion in denying the motion."); Tex. R. Civ. P. 251 ("[N]or shall any continuance be granted except for sufficient cause supported by affidavit . . . .").